UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANDREW DAVENPORT                          CIVIL ACTION

VERSUS                                    NUMBER: 13-0505

ROBERT TANNER, ET AL.                     SECTION: "A"(5)


**<u>ORDER AND REASONS</u>**

Presently before the Court is the motion for partial dismissal based on qualified immunity of Defendants, Robert Tanner, Warden of the B.B. "Sixty" Rayburn Correctional Center ("RCC"); Doctor Casey McVea; Major Jeff Williams; Lieutenant Brian Brumfield; Captain James B. Seal; and Sergeant Master Tim Knight. [1]  (Rec. doc. 39).  Also before the Court are Plaintiff's memorandum in opposition to Defendants' motion and Plaintiff's Rule 7(a) *Schultea* reply.  (Rec. docs. 40, 38).  For the reasons that follow, it is recommended that Defendants' motion be granted.

Earlier on in this case, a preliminary conference[2] was held with Plaintiff and counsel for Defendants participating, at the conclusion of which counsel for Defendants were ordered to provide the Court with a copy of RCC's written policies governing strip and/or body-cavity searches and a copy of Plaintiff's medical records that were generated

---

[1] Dr. McVea joins in the present motion, which is directed to Plaintiff's claims of excessive force and unreasonable search, while reserving his right to file a separate motion on Plaintiff's claim of deliberate indifference to his medical needs.  (Rec. doc. 39, p. 1, n. 1).  Three other Defendants, Secretary James M. LeBlanc of the Louisiana Department of Public Safety and Corrections, Nurse Wendy Seal, and EMT Jane A. Hillman, were previously dismissed from this lawsuit.  (Rec. doc. 36, 35).

[2] Although scheduled as a preliminary conference, the conference was actually more akin to a *Spears* hearing which is in the nature of an amended complaint or a more definite statement under Rule 12(e).  *See Jackson v. Vannoy*, 49 F.3d 175, 176-77 n. 4 (5th Cir.), *cert. denied*, 516 U.S. 851, 116 S.Ct. 148 (1995).

at RCC.  (Rec. doc. 24).  A certified copy of those documents has now been provided to the Court and to Plaintiff along with a certified copy of Plaintiff's prison disciplinary records. For his part, Plaintiff has also been granted leave to enlarge the record with some of the same prison disciplinary, medical, and policy records that were furnished by the Defendants.  (Rec. doc. 25, 26).  Based upon a review of the record and the documentation that has been provided to the Court, the following facts can be discerned.

On December 31, 2012 at approximately 12:00 p.m., an RCC correctional officer detected an odor emanating from the area of cells 2 and 3 on the "Sun Unit 4 Right" that smelled like marijuana.  That officer was ordered by Major Williams to conduct a thorough search of the noted cells and the inmates who were housed therein, which search revealed no contraband.  Later that morning, pursuant to the orders of Major Williams, a drug screening test on the four offenders housed in the cells was conducted by Captain Seal using a "5 Panel Toxcup, Lot #M0259, Exp. Date 2013/09."   All of the test results came back negative except the one from Plaintiff, which was positive for the presence of THC. Upon being notified of the positive test result, Major Williams arrived on the Sun Unit and conducted a confirmation test utilizing a "Fastect II Drug Screen Dipstick Lot #FH0037, Exp. Date 2013/06."  That confirmation test was also positive for the presence of THC.  As a result of those positive drug test results, a Disciplinary Report was prepared by Captain Seal charging Plaintiff with possession of contraband.   Pending a hearing on that disciplinary violation, Plaintiff was transferred to Administrative Segregation in "Sun Unit 1 Left."  (Rec. doc. 38, pp. 23-24).

In connection with his transfer to Administrative Segregation, Plaintiff was ordered by Captain Seal to remove his clothing and to submit to a "Visual Body Cavity Search."[3]  In his pleadings and again during the course of the preliminary conference, Plaintiff complained that the terminology that was used in connection with that order was for him to "bust it open," a phrase that he finds to be derogatory.[4]  Although Plaintiff alleges that he proceeded to squat and cough, he readily admits that he repeatedly refused multiple commands to submit to the required visual search.  After being informed of Plaintiff's recalcitrance, Major Williams arrived on the scene and repeated the order which Plaintiff continued to refuse, declaring that no one was going to perform the search, not even the prison doctor.  Plaintiff stated that he went through the "strip search process" that he preferred (*i.e.,* squatting and coughing) several times with Major Williams and Lieutenant Brumfield but continually refused the officers' repeated and purportedly derogatory orders.

According to the Unusual Occurrence Report ("UOR") that was generated in connection with the incident, Major Williams communicated Plaintiff's repeated refusals to Deputy Warden Keith Bickham who, in turn, conveyed the information to Warden Tanner.

---

[3] Regulation No. C-02-003(6)(E)(5)of the Louisiana Department of Public Safety and Corrections defines a "Visual Body Cavity Search (Strip Search/Genital Examination)" as "[a] search having the characteristics of strip search with the addition of a visual search of the anal and/or vaginal openings, whereby the offender being searched is required to open the cheeks of the buttocks and/or the lips of the vagina."  A "Strip Search", in turn, is defined in Section 6(E)(4) as "[a] visual search of an offender's nude body . . ." in which "[t]he offender being searched may be required to bend over, squat, turn around, raise his arms and lift the genitals. (The foregoing list is typical, not exclusive.)"  Section 7(E)(3) of Regulation No. C-02-003 provides that "[a] visual body cavity search may be conducted ROUTINELY, without a showing of reasonable suspicion and special documentation . . . [w]hen an offender is entering or leaving a segregation area . . ."  (Emphasis in original).

[4] In Plaintiff's January 8, 2013 appeal from the Disciplinary Board's January 2, 2013 hearing which adjudicated him guilty of aggravated disobedience for refusing to submit to the search, he states that he was told to " . . . spread 'em . . .," an order that he admittedly refused.

The Warden then instructed the prison physician, Dr. Casey McVea, to conduct a body-cavity search of Plaintiff at the infirmary if Plaintiff persisted with his refusal to submit to a visual body-cavity search.  Plaintiff was then placed in mechanical restraints and was escorted to the infirmary by Captain Seal and Lieutenant Brumfield where he alleges that he was again told to "bust it open," lest his jailors do so for him.  In a second UOR that was generated on that date, Major Williams reported that while waiting for Dr. McVea to arrive at the infirmary, Plaintiff stated that "I need to go on suicide watch."  When asked if he intended to hurt himself, Plaintiff replied, "I might.  I'm under too much stress because of all of these write ups I'm gonna get.  I need to delay court until the results of my piss test come back from the lab.  If I'm on suicide watch, I can't go to court."  That information was conveyed to Nurse Cooper and Plaintiff would later be placed on standard suicide watch.

At the infirmary, the handcuffs were removed from Plaintiff and he was given a final opportunity to voluntarily submit to a visual body-cavity search.  Once again, Plaintiff refused.  Captain Seal, Major Williams, Lieutenant Brumfield, and Sergeant Master Knight then placed Plaintiff on the examination table in order for the doctor to conduct a physical body-cavity search.  According to Plaintiff, also present in the room were Nurse Seal and EMT Hillman.  Plaintiff was cuffed and the body-cavity search was performed by Dr. McVea. A short time later, the doctor memorialized for inclusion in Plaintiff's medical chart the circumstances surrounding the procedure that was performed, as follows:

> I was summoned by Warden Bickham at approximately 7:15 a.m. to perform a body cavity search on the above named offender because he had refused a visual body search prior to being locked up on a contraband violation.  I reported to the infirmary as instructed, and the above named offender was given a final opportunity to submit to a visual search which he refused.  At approximately 8:00 a.m. the offender was physically restrained by security. At that time I inserted my gloved and lubricated index finger in the offender's rectum.  I palpated no contraband and my finger was withdrawn.  No trauma

4

was noted to the sphincter and no blood was noted on the glove.  The offender stated, "Well I feel gay, now."  He immediately complained, "I feel like I am bleeding."  I know that this was a false complaint because I had just checked for the presence of blood.  I released the offender to return to the cellblock.

Included in Plaintiff's medical records is a "Health Care Information" form dated January 1, 2013 at 7:00 a.m. documenting a complaint of "post use of force" followed by a notation that "[n]o injuries noted at this time ambulating well per self."  The UOR that was completed by Captain Seal in connection with the incident concludes with a recitation of Plaintiff's pre-search statements of his desire to be placed on suicide watch to delay the prison disciplinary proceedings that inevitably followed.  Subsequent to the search, Plaintiff was escorted to Sleet 4 and was placed on standard suicide watch.  As a result of the incidents of that day, Plaintiff was issued rules violations for possession of contraband and aggravated disobedience[5] for disobeying the multiple verbal commands to submit to a visual body-cavity search.  While Plaintiff was originally found guilty of the contraband violation and was stripped of 90 days of "good time" credits, that conviction was ultimately overturned after laboratory testing came back negative for the presence of THC and the good time credits were restored.  For the aggravated disobedience charge, Plaintiff was sentenced to a loss of 90 days of good time credits and a transfer to Extended Lockdown

---

[5] Section 341(I)(5), tit. 22, pt. I of the Louisiana Administrative Code, in defining aggravated disobedience, provides as follows:

> [o]ffenders must obey direct verbal orders cooperatively and promptly and not debate, argue or ignore orders before obeying.  The last order received must be obeyed when orders conflict.  Even orders the offender believes improper must be obeyed; grievances must be pursued through proper channels.  Sanctions imposed by the disciplinary officer or the disciplinary board are to be carried out by the offender.  Violations of duty status will apply to this rule as will a violation of an order from the disciplinary board.  The only valid defense for disobedience or aggravated disobedience is when the immediate result of obedience would be bodily injury.  (This defense includes incapacity by virtue of a certified medical reason.)

Level I.  Plaintiff's appeal of that adjudication was denied by both Warden Tanner and Secretary LeBlanc and that disciplinary conviction remains in place.

As noted above, subsequent to the search Plaintiff was placed on standard suicide watch.  The personal effects in his original cell were secured and placed in a locker under seal in the Sun Unit storage room.  On January 2, 2013, Plaintiff was observed to be resting quietly in his bed in no acute distress and with even and unlabored respiration.  On January 3, 2013, Plaintiff was downgraded from standard suicide watch to mental health observation.  On January 6, 2013, some five days after the incident in question, Plaintiff made a routine sick call request for "rectum pain, neck pain" due to being searched on January 1, 2013.  Examining medical personnel noted no injury, swelling, or bruising to the neck which had a good range of motion.  No treatment was deemed to be necessary at that time.  The treatment note from that date indicates that Plaintiff requested Ultram which apparently had been previously prescribed for him but had been discontinued.  The examination findings and Plaintiff's chart were forwarded to the prison doctor who issued no treatment orders.  On January 8, 2013, Plaintiff made an emergency sick call request for an "alleged assault" on January 1, 2013, complaining of neck pain and pain to the rectum.  No obvious bruising or edema were noted to the neck or upper back and Plaintiff refused a visual assessment of his rectum purportedly secondary to complaints of pain.  He was given Tylenol for relief and the examiner's findings were reviewed by the doctor who made no additional orders.  In connection with his refusal to allow a visual inspection of his rectum by medical personnel, Plaintiff executed a form denominated "Refusal to Accept Medical or Mental Health Care" in which he ". . . release[d] the Department of Public Safety and Corrections from any liability for any harm that may result from this refusal of treatment."

6

On January 10, 2013, Plaintiff made routine sick call again for complaints of dry skin to his legs and to obtain more pain medication as the medication that he was taking was allegedly not effective.  No dry skin was noted on Plaintiff's legs.  He was advised to keep the complained-of areas clean and to make sick call again if problems persisted.  The examination findings were once again provided to the RCC physician who concurred that no treatment orders were called for at that time.  A "Doctor's Call" note was completed by Dr. McVea on January 15, 2013 with the chief complaint being identified as "CCV MR." Plaintiff was given a refill of Vasotec.  A second "Doctor's Call" note was completed by Dr. McVea on January 30, 2013 with the chief complaint being "CCV F/U 10/30/12."  That follow-up was cancelled and treatment was deferred to "ortho."  On January 30, 2013, Plaintiff made a routine sick call again for complaints of neck pain secondary to the alleged incident that occurred on New Year's Day.  The examining EMT noted that Plaintiff had made the same complaint before.  Upon physical examination, no bruising or discoloration was noted and there was a full range of motion with no obvious injury.  The examination was characterized as normal.  Those findings were reviewed by Dr. McVea who issued no treatment orders and noted that Plaintiff had received a rules violation for malingering for making three sick calls that month ". . . with little or no medical merit."  For that violation, Plaintiff would ultimately be stripped of 60 days of good time credits.

The Defendants now move for partial dismissal based on qualified immunity.  The doctrine of qualified immunity provides governmental officials performing discretionary functions with a shield against damages for civil liability, provided that their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006)(citing *Anderson v. Creighton*, 483 U.S.

635, 638, 107 S.Ct. 3034, 3038 (1987)).  In determining whether a governmental official is entitled to qualified immunity, the appropriate inquiry is:  1) whether the plaintiff has demonstrated a violation of a clearly established federal right and 2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known.  *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508 (2002)).  Those two prongs may be considered in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009).  Once raised, the plaintiff bears the burden of rebutting the qualified immunity defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  *Gobert*, 463 F.3d at 345 (quoting *Estate of Davis v. City of N. Richard Hills*, 406 F.3d 375, 380 (5th Cir. 2005)).

Liberally construing the allegations made by Plaintiff in his pleadings and various filings and during the course of the preliminary conference that was held in this case, he alleges that he declined correctional officers' serial orders, made in purportedly derogatory terms, for him to submit to a visual body-cavity search, as allowed by RCC regulations prior to his transfer to administrative segregation, because certain alternatives to the search were more to his liking.  However, "[c]laims of verbal insults, threats and derogatory remarks are not cognizable under §1983."  *Patin v. LeBlanc*, No. 11-CV-3071, 2012 WL 3109402 at *13-14 (E.D. La. May 18, 2012), *adopted*, 2012 WL 3109398 (E.D. La. July 31, 2012)(citing *Robertson v. Plano City*, 70 F.3d 21, 24 (5th Cir. 1995)).  Mere threatening language or gestures of a custodial officer do not, even if true, amount to a constitutional violation.  *Id.* (and cases cited therein); s*ee also McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983).  "Further, verbal sexual abuse does not violate an inmate's constitutional rights."  *McDowell v. Wilkinson County Corr. Facility*, No. 08-CV-0279, 2008 WL 5169632 at *7 (S.D.

Miss. Dec. 3, 2008)(citing *Doe v. City of Haltom*, 106 Fed.Appx. 906, 908 (5th Cir. 2004)).

That being the case, the question becomes whether the physical body-cavity search that

ensued after Plaintiff's repeated, admitted refusals to submit to the visual body-cavity

search amounted to the use of excessive force under the Eighth Amendment and

constituted an unreasonable search under the Fourth Amendment.   *See, e.g., Brown v.*

*Brooks*, No. 09-CV-6762, 2010 WL 2772659 at *5 (E.D. La. June 17, 2010), *adopted*, 2010

WL 2773393 (E.D. La. July 12, 2010).

   It is beyond peradventure that the Eighth Amendment prohibits the imposition of

cruel and unusual punishment on convicted prisoners like Plaintiff.   *Brown*, 2010 WL

2772659 at *5.   "'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and

unusual punishment forbidden by the Eighth Amendment.'"   *Hope v. Pelzer*, 536 U.S. 730,

737, 122 S.Ct. 2508, 2514 (2002)(quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct.

1078, 1084 (1986)).   "Among [the] 'unnecessary and wanton' inflictions of pain are those

that are 'totally without penological justification.'"   *Rhodes v. Chapman*, 452 U.S. 337, 346,

101 S.Ct. 2392, 2399 (1981)(quoting *Gregg v.* Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909,

2929 (1976).   In making this determination in the context of prison conditions, a court

must ascertain whether the officials involved acted with "deliberate indifference" to the

inmate's health or safety.   *Hope*, 536 U.S. at 738, 122 S.Ct. at 2514 (quoting *Hudson v.*

*McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 999 (1992)).   A court can infer the existence of the

required state of mind when the facts showing the risk of harm are obvious.   *Farmer v.*

*Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 1981 (1994).   The proof that is required to

establish an "unnecessary and wanton infliction of pain" varies according to the nature of

the alleged constitutional violation. *Hudson v. McMillian*, 503 U.S. 1, 5, 112 S.Ct. 995, 998 (1992)(quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1085 (1986)).

In the prison setting, the "core judicial inquiry" in considering a claim of excessive force under the Eighth Amendment is not whether a certain quantum of injury was sustained but "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175, 1178 (2010)(quoting *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999). "'Often, of course, there will be no evidence of the detention facility official's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent.'" *Fontenot v. Gusman*, No. 11-CV-1772, 2012 WL 5196426 at *9 (E.D. La. Oct. 18, 2012)(quoting *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993)). Courts consider the following five nonexclusive factors in determining intent and whether an excessive force claim has been established:  1) the extent of the injury suffered; 2) the need for the application of force; 3) the relationship between the need for and the amount of force used; 4) the threat reasonably perceived by the officials; and, 5) the efforts made to temper the severity of a forceful response. *Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998).

As made clear by the Supreme Court, "[w]hen prison officials maliciously and sadistically use force to cause harm contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000.  However, not every malevolent touch by a prison guard gives rise to a federal cause of action. *Id.*  The Eighth Amendment's prohibition against cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force provided that the use of force is not of a sort repugnant to the conscience of mankind. *Id.*

"[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a given situation 'or instead evince[ ] such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'"  *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999. In order to prevail, a prisoner ". . . will ultimately have to prove not only that the assault actually occurred but also that it was carried out 'maliciously and sadistically' rather than as part of 'a good-faith effort to maintain or restore discipline.'"  *Wilkins*, 559 U.S. at 40, 130 S.Ct. at 1180 (quoting *Hudson*, 503 U.S. at 9, 112 S.Ct. at 1180).

Finally, the Fifth Circuit has recognized that "[w]hile violent sexual assaults involving more than *de minimis* force are actionable under the Eighth Amendment, . . . isolated, unwanted touchings by prison employees, through 'despicable and, if true, [ ] may potentially be the basis of state tort actions . . . they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.'"  *Copeland v. Nunan*, 250 F.3d 743, 2001 WL 274738 at *3 (5th Cir. 2001)(quoting *Boddie v. Schneider*, 105 F.3d 857, 860-61 (2nd Cir. 1997)).  "Only 'severe or repetitive' sexual abuse rises to the level of an Eighth Amendment violation."  *Brown v. Sloan*, No. 09-CV-1066, 2010 WL 476720 at *1 (W.D. La. Feb. 10, 2010)(quoting *Boddie v. Schneider*, 105 F.3d 857, 861 (2nd Cir. 1997)).

Applying the foregoing standards to the facts at hand, the Court finds that the Defendants acted reasonably under the circumstances that they were presented with and that Plaintiff was not subjected to an unconstitutionally excessive use of force in connection with the search in question.  As noted by the moving Defendants, Plaintiff largely admits that the injuries he allegedly suffered occurred during the course of his efforts to physically resist the body-cavity search.  (Rec. doc. 38, p. 7).  The medical records that have been

provided to the Court indicate that following the search, Plaintiff was seen at the RCC infirmary for "post use of force" at which "[n]o injuries [were] noted @ this time [and Plaintiff was] ambulating well per self." Pursuant to his request and in an attempt to delay and otherwise thwart the prison disciplinary process, Plaintiff was moved to standard suicide watch and on January 2, 2013 at 4:00 a.m. was observed to be "resting quietly in bed . . . with resp[iration] even + unlabored" and in no acute distress. It was some five days after the search, on January 6, 2013, that Plaintiff made a routine sick call request in which he for the first time complained of rectum and neck pain. The medical examiner's assessment at that time revealed no injuries and Plaintiff's neck had no swelling or bruising with a good range of motion and thus no treatment was warranted at that time. Plaintiff did, however, request a supply of Ultram that had apparently been previously prescribed to him but had been discontinued. The examiner's findings were then provided to the prison physician who issued no orders for treatment in light of the wholly benign objective findings.

Two days later on what was then one week post-incident, Plaintiff made an emergency sick call request complaining of an "alleged assault" and pain to the neck and rectum. Physical examination revealed no obvious bruising or edema to the neck or upper back and Plaintiff refused even a visual examination of his rectum supposedly secondary to pain. Plaintiff also executed a form acknowledging his refusal to submit to the recommended examination. A subsequent routine sick call request on January 10, 2013 was for dry skin and an attempt to obtain stronger pain medication. No treatment was recommended by either the attending EMT or the jail physician. Plaintiff was given a refill of his hypertension medication on January 15, 2013. A follow-up appointment scheduled

for January 30, 2013 was cancelled.  However, Plaintiff was seen that day for a complaint of neck pain on a routine sick call request.  The medical examiner noted that Plaintiff had lodged such a compliant before and a physical examination revealed no bruising or discoloration, a full range of motion, and no obvious injury.  Given the normal examination results, no treatment was ordered and Plaintiff was instead issued yet another disciplinary report for malingering.

The objective findings in the medical records summarized above[6/] do not document injuries consistent with Plaintiff's allegations and are not sufficient to show that he suffered anything more than a *de minimis* injury, if any, that was inconsistent with the use of excessive force.  *Brown*, 2010 WL 2772659 at *7 (and cases cited therein).  In terms of the need for the application of force, it cannot be disputed that in the prison setting, an inmate's persistent refusal to follow validly-given orders poses a threat to security and thus presents a need to restore discipline.  *Poe v. Texas Dept. of Criminal Justice*, 306 Fed.Appx. 866, 868 (5th Cir. 2009)(use of chemical agents and forcible cell entry not excessive or objectively unreasonable where inmate failed to obey orders to relinquish control of food slot in door).  Plaintiff admits to refusing officials' valid orders to submit to an authorized visual body-cavity search and to physically resisting the physical body-cavity search that he was repeatedly warned would ensue if he failed to comply.  Like the Plaintiff in *Collins v. Scott*, 961 F.Supp. 1009, 1016 (E.D. Tex. 1997), "Plaintiff's persistence in disobeying orders intensified the seriousness of the breach of security," making the use of some degree of force reasonable.  Correctional officials, not inmates, are the proper authorities to dictate prison policy.  *Id.*  The evidence before the Court also shows that only that amount of force

---

[6/] Such records may properly be considered by the Court.  *See e.g.*, *Gobert v. Caldwell*, 463 F.3d 339, 346 n. 24 (5th Cir. 2006).

necessary to gain compliance with prison officials' orders was used during the incident in question.

Turning to the fourth *Baldwin* factor, in the time period preceding the search an officer had detected the odor of marijuana emanating from the area where Plaintiff was housed and Plaintiff had tested positive for THC twice.  He then repeatedly and continuously refused valid orders to submit to a visual body-cavity search.  Given jail officials' clearly recognized interests in curbing the use of illegal drugs at the prison, the Defendants were wholly justified in using a minimal amount of force to effectuate the physical body-cavity search after Plaintiff repeatedly and steadfastly refused the less invasive visual search.  *Block v. Rutherford*, 468 U.S. 576, 587-88, 104 S.Ct. 3227, 3233 (1984); *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884-85 (1979).  That Plaintiff would later be cleared of the contraband charge following further laboratory testing is of no moment, as the reasonableness of the Defendants' actions is evaluated as of the time that the search in question occurred.  *Pearson*, 555 U.S. at 232, 129 S.Ct. at 815-16.  Finally, the records before the Court quite clearly reflect the Defendants' repeated efforts to have Plaintiff comply with their valid requests to submit to the visual body-cavity search.  Unfortunately, those efforts were unavailing and the physical search became necessary.  Having considered the five factors set forth in *Baldwin*, the degree of force used by the Defendants was not sufficiently excessive or objectively unreasonable to overcome the qualified immunity that they enjoy.

The Defendants next move for qualified immunity on Plaintiff's Fourth Amendment claim, arguing that the search was necessary and was conducted in a reasonable manner. For the reasons that follow, the Court agrees.

14

An inmate's Fourth Amendment protections are greatly limited in the context of prison searches, his rights being diminished by the needs and exigencies of the institution in which he is incarcerated through a balancing test measured against the institution's legitimate penological concerns. *Moore v. Carwell*, 168 F.3d 234, 236-37 (5th Cir. 1999); *Elliott v. Lynn*, 38 F.3d 188, 190-91 (5th Cir. 1994), *cert. denied*, 514 U.S. 1117, 115 S.Ct. 1976 (1995); *United States v. Lilly*, 576 F.2d 1240 (5th Cir. 1978), *abrogated on other grounds by Hudson v. Palmer*, 468 U.S. 517, 522-23, 104 S.Ct. 3194, 3198 (1984). "Strip searches, including visual cavity searches, on convicted prisoners do not require probable cause or reasonable suspicion." *Scheidel v. Garner*, No. 12-CV-1815, 2013 WL 3778917 at *1 (W.D. La. July 17, 2013)(citing *Bell*, 441 U.S. at 558-59, 99 S.Ct. at 1884). In the prison context, the Fourth Amendment requires only that such searches be reasonable under all the facts and circumstances in which they are performed. "The test of reasonableness under the Fourth is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884. The Fifth Circuit has interpreted this reasonableness standard as striking a balance in favor of deference to prison authorities' views on institutional safety against the admittedly legitimate claims of inmates not to be searched in a humiliating and degrading manner. *Elliott*, 38 F.3d at 193. The burden of proving the reasonableness of a search is a light one because an administrator's decisions and actions in the prison context are entitled to great deference. *Elliott*, 38 F.3d at 191; *Lilly*, 576 F.2d at 1245. For purposes of Fourth Amendment analysis,

15

courts look to the objective reasonableness of conducting a search and not the officer's subjective intent. *McCreary v. Richardson*, 738 F.3d 651, 657 (5th Cir. 2013).

Here, the justification for the physical body-cavity search of Plaintiff is apparent. The odor of marijuana was detected in the area where he was housed and he twice tested positive for the presence of THC.   Given that a search of the suspected inmates' cells revealed no drugs, correctional officers could reasonably believe that contraband may have been concealed within Plaintiff's body. *See Delmast v. Cardenas*, No. 09-CV-0629, 2011 WL 4591938 at *15 (E.D. Tex. Sept. 1, 2011), *adopted*, 2011 WL 4591932 (E.D. Tex. Sept. 30, 2011), *appeal dismissed*, 497 Fed.Appx. 424 (5th Cir. 2012).   As a result of the positive drug test results, Plaintiff was charged with a contraband violation and was transferred to administrative segregation pending formal disciplinary proceedings.   In connection with that transfer, RCC regulations mandated that Plaintiff submit to a visual body-cavity search which he admittedly and repeatedly refused.   Had Plaintiff complied with that valid request, the search would have been conducted in his own single-man cell outside the view of others except the officers conducting the search.   Instead, Plaintiff's obstinance left officials with little choice but to escort him to the infirmary where he was given one final opportunity to submit to the non-invasive visual search but declined. *Henning v. Sowders*, 19 F.3d 1433, 1994 WL 83259 at *3 (6th Cir. 1994)(upholding involuntary body cavity search of female inmate by male officers after less invasive alternative rejected).   The extremely brief physical search that followed was performed by medical personnel in the confines of the infirmary.   While Plaintiff maintains that the physical search was not authorized by Section 7(F)(1) of Regulation No. C-02-003 because it was not preceded by a visual body-cavity search, Plaintiff cannot dictate prison policy simply by refusing the

16

visual search in the first instance and, in any event, the violation of prison regulations by jail officials does not, in and of itself, amount to a constitutional violation.  *McCoy v. Fox*, 587 Fed.Appx. 802, 805 (5th Cir. 2014); *Lyle v. Beard*, 137 F.3d 1352, 1998 WL 92513 at *1 (5th Cir. 1998).

Notwithstanding Plaintiff's allegations to the contrary, the documentary evidence that is before the Court provides no support that the search was conducted in a derogatory manner.  As noted earlier, even assuming that untoward language was directed at Plaintiff during the course of the search, such is not actionable under §1983, *Doe v. City of Haltom*, 106 Fed.Appx. 906, 908 (5th Cir. 2004), and the Court has previously determined that the presence of female guards did not amount to a constitutional violation.  (Rec. docs. 36, 35). *See also Roden v. Sowders*, 84 Fed.Appx. 611, 612-13 (6th Cir. 2003)(strip search of male prisoner in presence of female officer upheld where prisoner was suspected of smoking marijuana).   Considering the circumstances that confronted them, Defendants' actions were not objectively unreasonable violations of clearly established law.

For the foregoing reasons, it is ordered that Defendant's motion for partial dismissal is granted and that Plaintiff's excessive force claim under the Eighth Amendment and his Fourth Amendment claim are dismissed.

New Orleans, Louisiana, this 31st day of _____ July _____, 2015.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE